MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
MAYA SORENSEN (State Bar No. 250722)
TERESA ALLEN (State Bar No. 264865)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California 94612
Telephone: (510) 452-5500
Facsimile: (510) 452-5510

SANJAY S. SCHMIDT (SBN 247475)
LAW OFFICE OF SANJAY S. SCHMIDT
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Telephone: (415) 563-8583
Facsimile: (415) 223-9717

*Attorneys for Plaintiff*
*Jeremy Lapachet*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY LAPACHET,<br><br>            Plaintiff,<br><br>      vs.<br><br>CALIFORNIA FORENSIC MEDICAL GROUP, INC., TAYLOR FITHIAN, M.D., LANI ANTONIO, P.A., VERONICA BERGHORST, R.N., JESSAMAE TRINIDAD, R.N., GRASHIKA DEVENDRA, Psychiatric R.N., TABITHA KING, L.V.N., AMARDEEP TAWANA, L.V.N., JUDITH ALEJANDRE, L.V.N., COUNTY OF STANISLAUS, a municipal corporation, CORRECTIONS DEPUTIES H. DEOL, A. TORRES, D. MARTINEZ, GALLO, Y. LEE, SERGEANT HUSMAN, and DOES 7 THROUGH 50, Jointly and Severally,<br><br>            Defendants. | No: 1:17-cv-01226-DAD-EPG<br><br>Judge: Hon. Dale A. Drozd<br><br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES, DECLARATORY & INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL**<br><br>1. 42 U.S.C. § 1983 – Civil Rights Violations – Deliberate Indifference to Medical Needs<br>2. 42 U.S.C. § 1983 – Civil Rights Violations – Unlawful Uses of Force<br>3. 42 U.S.C. § 1983 – Municipal Liability<br>4. California Civil Code § 52.1 (b) – State Civil Rights Violations<br>5. Medical Negligence |

Plaintiff, by and through his attorneys, HADDAD & SHERWIN LLP and the LAW OFFICE OF SANJAY S. SCHMIDT, for his First Amended Complaint against Defendants, states the following:

### JURISDICTION

1. This is a civil rights action, arising from use of unreasonable force – on Plaintiff by COUNTY OF STANISLAUS Correctional Officers and/or, in addition to or in the alternative, the COUNTY OF STANISLAUS and CALIFORNIA FORENSIC MEDICAL GROUP, INC., Defendants' failure to provide for the serious medical needs of the Plaintiff, who was in Defendants' custody, as well as the failure to provide treatment and self-harm and/or suicide attempt precautions, and other legal obligations concerning Plaintiff's serious medical needs, including medical negligence, which occurred in Monterey County and Stanislaus County, California, resulting in Plaintiff's paralysis – as well as other serious and permanent bodily injuries, on or about October 25, 2015 - October 26, 2015.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because it is being brought to obtain compensatory and punitive damages for the deprivation, under color of state law, of the rights of citizens of the United States that are secured by the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988.  This action is brought pursuant to the Eighth Amendment to the United States Constitution, and the laws and Constitution of the State of California.  Plaintiff invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 (a), to hear and decide claims arising under state law.  **This First Amended Complaint is filed pursuant to the Order Granting In Part and Denying in Part Defendants' Motion to Dismiss.  (Doc. 65).**

2. Venue is proper, because the Northern District Court granted Defendants' motions to transfer venue to the Eastern District. (N.D. Case No. 4:16-cv-06959 HSG, Doc. 42).

## PARTIES AND PROCEDURE

3.      Plaintiff JEREMY LAPACHET (hereafter "Mr. Lapachet," "Lapachet," or "LAPACHET) is a citizen of the United States and a competent adult.

4.      Defendant COUNTY OF STANISLAUS ("COUNTY") is a municipal corporation, duly organized and existing under the laws of the State of California, and is the employer of the individual COUNTY defendants, as well as certain DOE DEFENDANTS. Under its authority, the COUNTY operates the Stanislaus County Sheriff's Department ("SCSD") and the Stanislaus County Jail.

5.      Defendant CORRECTIONS DEPUTIES H. DEOL, A. TORRES, D. MARTINEZ, GALLO, Y. LEE, and SERGEANT HUSMAN were all corrections deputies employed by the SCSD and working at the Stanislaus County Jail, and each was responsible for observing, monitoring, and protecting JEREMY LAPACHET and/or directly participated in or observed and permitted unlawful uses of force against JEREMY LAPACHET when Mr. LAPACHET already was gravely injured and paralyzed.  At all material times, Defendant CORRECTIONS DEPUTIES H. DEOL, A. TORRES, D. MARTINEZ, GALLO, Y. LEE, and SERGEANT HUSMAN acted in the course and scope of their employment with the SCSD. Further, each of these named Defendants was an integral participant in many of the events described herein.

6.      Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG") was at all times herein mentioned a California Corporation, licensed to do business in California, with its corporate headquarters located in Monterey, California.  At all material times, Defendant CFMG provided medical, mental health, and nursing care to pretrial and post-conviction detainees and prisoners in COUNTY Jails, pursuant to a contract with the COUNTY OF STANISLAUS.  On information and belief, CFMG and its employees and agents are and were at all material times responsible for making and executing policies, procedures, and training related to the medical care and/or mental health care of detainees and prisoners in the COUNTY OF STANISLAUS jails, including, but not limited to, properly assessing and

classifying inmates, properly assessing and addressing the general mental health and general medical needs of inmates, and properly assessing and treating the serious medical and mental health needs of inmates, including, but not limited to, prevention of self-harm, suicide attempt prevention, suicide prevention, and observation and treatment of: suicidal and potentially suicidal inmates, inmates suffering from drug induced psychosis, inmates suffering from drug overdoses, and inmates suffering adverse effects from drug ingestion, and/or mental illness, and/or emotional disturbance.  Defendants TAYLOR FITHIAN, M.D. ("FITHIAN"), LANI ANTONIO, P.A., VERONICA BERGHORST, R.N., JESSAMAE TRINIDAD, R.N., GRASHIKA DEVENDRA, Psychiatric R.N., TABITHA KING, L.V.N., AMARDEEP TAWANA, L.V.N., JUDITH ALEJANDRE, L.V.N., the to-be-identified CFMG Stanislaus County Program Manager, any other, to-be-identified CFMG Psychiatric Nurse or Nurses responsible for the COUNTY OF STANISLAUS jails, all other to-be-identified (currently named as "DOEs") CFMG nurses, LVNs, or other staff, as well as certain other DOE Defendants including, but not limited to, CFMG employees and agents, were acting within the course and scope of their employment with CFMG (and within the course and scope of their employment by COUNTY by virtue of CFMG's contract with COUNTY) and were responsible for properly assessing and classifying inmates, properly assessing and addressing the general mental health and general medical needs of inmates, and properly assessing and treating the serious medical and mental health needs of inmates, including, but not limited to, prevention of self-harm, suicide attempt prevention, suicide prevention, and observation and treatment of: suicidal and potentially suicidal inmates, inmates suffering from drug induced psychosis, inmates suffering from drug overdoses, and inmates suffering adverse effects from drug ingestion, and/or mental illness, and/or emotional disturbance, as well as providing appropriate observation and a treatment plan for serious medical needs, prevention and addressing the risk of self-harm by inmates, suicide attempt prevention, suicide prevention, appropriate observation of suicidal or otherwise emotionally disturbed inmates, providing appropriate observation and a treatment plan for inmates suffering the effects of controlled substances,

drug-induced states of psychosis, and/or overdoses, and/or inmates who are a danger to themselves by virtue of being under the influence of drugs, and/or mental illness, and/or emotional disturbance, as well as care and treatment for mental illness and emotional disturbance, monitoring the mental health and vital signs of inmates, and promptly rendering and/or summoning medical care when it was needed, including, but not limited to, transferring inmates/patients to inpatient emergency medical or psychiatric facilities.

7.    Plaintiff is informed, believes, and thereon alleges that Defendants FITHIAN and other CFMG employees, agents, and to-be-identified Defendants, at all material times, lived and worked in Monterey County, and performed, directed, oversaw, or supervised telepsychiatry and other medical services at COUNTY OF STANISLAUS's jails remotely, from Monterey, California.  In addition, Defendant FITHIAN oversees all statewide jail operations for CFMG, and sets policies and procedures for all operations, from Monterey County, California, including, but not limited to, perpetuating and approving all policies and procedures that led to Plaintiff's injuries – as well as perpetuating and approving the lack of necessary policies and procedures, as more fully alleged *infra* – and approving or perpetuating policies, or the lack thereof, relating to effectuating, ordering, or otherwise ensuring the transfer of county jail inmates to hospitals for emergency medical and mental health care.

8.    On information and belief, CFMG and Defendant TAYLOR FITHIAN, M.D. are responsible for making and enforcing policies, procedures, and training related to the medical and mental health care of prisoners and detainees in Defendant COUNTY OF STANISLAUS's jail, including: assessing inmates for self-harm risk, prevention of self-harm, suicide attempt prevention, suicide prevention, and observation and treatment of: suicidal, emotionally disturbed, potentially suicidal, inmates suffering from drug induced psychosis, inmates suffering from drug overdoses, and inmates suffering adverse effects from drug ingestion, and/or mental illness, and/or emotional disturbance; instituting appropriate precautions and measures to address these conditions; approving housing classification that takes into account these conditions; instituting appropriate observation to prevent self-harm or

attempted suicide; instituting appropriate treatment plans for the serious mental health needs of inmates; communicating about an inmate's self-harm, suicide attempt, or suicide risk with custodial staff, health care professionals, and outside facilities; and, where indicated, effectuating, ordering, or otherwise ensuring the transfer of county jail inmates to hospitals for emergency medical and mental health care.

9.      Defendant TAYLOR FITHIAN, M.D., ("FITHIAN") was at all times herein mentioned a physician licensed to practice medicine in the State of California, a Board-certified psychiatrist, and a director, managing agent, employee, and/or agent of Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, overseeing the provision of medical and psychiatric care at Defendant COUNTY OF STANISLAUS's jail, and was acting within the course and scope of that employment at all material times.  Defendant FITHIAN was responsible for overseeing and providing medical and mental health care to prisoners and detainees, and for instituting appropriate policies, procedures, and training concerning prevention of self-harm, suicide attempt prevention, suicide prevention, and observation and treatment of: suicidal and potentially suicidal inmates, inmates suffering from drug induced psychosis, inmates suffering from drug overdoses, and inmates suffering adverse effects from drug ingestion, and/or mental illness, and/or emotional disturbance, as well as providing appropriate observation and a treatment plan for serious medical needs, prevention and addressing the risk of self-harm by inmates, suicide attempt prevention, suicide prevention, appropriate observation of suicidal or otherwise emotionally disturbed inmates, providing appropriate observation and a treatment plan for inmates suffering the effects of drug-induced states of psychosis and/or overdoses and/or inmates who are a danger to themselves by virtue of being under the influence of drugs and/or mental illness and/or emotional disturbance, as well as care and treatment for mental illness and emotional disturbance, monitoring the mental health and vital signs of inmates, promptly rendering and/or summoning medical care when it is needed and, where indicated, effectuating, ordering, or otherwise ensuring the transfer of county jail inmates to hospitals for emergency medical and/or mental health care, which

responsibilities and oversight on the part of FITHIAN included risk assessment and prevention protocols for all of these issues.  On information and belief, Defendant FITHIAN was ultimately responsible for CFMG's provision of medical and mental health care to inmates at the COUNTY jail, including prevention of self-harm, suicide attempt prevention, suicide prevention, and observation and treatment of: suicidal and potentially suicidal inmates, inmates suffering from drug induced psychosis, inmates suffering from drug overdoses, and inmates suffering adverse effects from drug ingestion, and/or mental illness, and/or emotional disturbance, as well as providing appropriate observation and a treatment plan for serious medical needs, prevention and addressing the risk of self-harm by inmates, suicide attempt prevention, suicide prevention, appropriate observation of suicidal or otherwise emotionally disturbed inmates, providing appropriate observation and a treatment plan for inmates suffering the effects of drug-induced states of psychosis and/or overdoses and/or inmates who are a danger to themselves by virtue of being under the influence of drugs and/or mental illness and/or emotional disturbance, as well as care and treatment for mental illness and emotional disturbance, monitoring the mental health and vital signs of inmates, promptly rendering and/or summoning medical care when it is needed, and, where indicated, effectuating, ordering, or otherwise ensuring the transfer of county jail inmates to hospitals for emergency medical and/or mental health care or transferring inmates to inpatient psychiatric facilities where their medical needs require such a transfer.  At all material times, Defendant FITHIAN was the highest policy-making official for Defendant CFMG.

10. Furthermore, Defendant FITHIAN was at all times responsible for the medical and psychiatric care provided to JEREMY LAPACHET at COUNTY's jail, and for making sure that LAPACHET was placed on appropriate drug use or drug withdrawal monitoring, that he received a toxicology screening to ascertain any substance he was under the influence of, that he received drug-induced psychosis monitoring and care, self-harm precautions, suicide attempt precautions, and FITHIAN was responsible for effectuating, ordering, or otherwise ensuring the transfer of JEREMY LAPACHET to a hospital for emergency medical and/or

mental health care, and was responsible for ensuring that, in general, Plaintiff was timely provided all necessary and appropriate medical and mental health care for all of his medical and mental health needs.

11.     In addition, Defendant FITHIAN was at all times responsible for staffing the CFMG medical and psychiatric services at the COUNTY jail, including, but not limited to, making sure that only properly licensed and credentialed health care providers provide care, and that no provider work outside his or her scope of practice or licensure.

12.     Certain DOE Defendants, at all material times, were employees and agents of Defendant COUNTY OF STANISLAUS, who were responsible for assigning Mr. Lapachet to appropriate housing and housing classification, with appropriate observation and care rendered to him, given his risk of self-harm, his risk of suicide-attempt, his ingestion of a controlled substance, the possibility he was suffering from a drug-induced state of psychosis, the possibility he was suffering from grave, life-threatening, and acute effects from the ingestion of a substance, his medical needs, his excessively elevated vital signs, and other indicators.  These to-be-identified DOE Defendants were also responsible for protecting Plaintiff – and had state and federal duties to protect Plaintiff – from harm inflicted by other COUNTY employees and jail staff, other inmates, and any third parties.  In doing the acts or omissions hereinafter described, certain DOE Defendants acted within the course and scope of their employment with Defendant COUNTY OF STANISLAUS and acted under color of state law.  The individually named Defendants and certain DOE Defendants were either Correctional Officers, Sheriff's Deputies, Sergeants, Captains, Lieutenants, or other Peace Officers, Doctors, Nurses, Social Workers, and/or civilian employees and/or agents who were responsible for the care, housing, observation, and safety of inmates, including JEREMY LAPACHET, and/or the transfer of JEREMY LAPACHET to an inpatient facility for inpatient medical and/or psychiatric care.

13.     Certain DOE Defendants, at all material times, were employees and agents of Defendant COUNTY OF STANISLAUS; pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure, Plaintiff alleges in the alternative that these to-be-identified DOE Defendants

viciously attacked Mr. Lapachet and/or dragged Mr. Lapachet in a violent fashion in such a fashion so as to injure his head and/or neck and/or failed to protect Mr. Lapachet and/or otherwise used excessive and unreasonable force on Plaintiff, including, but not limited to, dragging him when he was already severely injured, paralyzed and not resisting and/or applying multiple unnecessary and improper pain compliance holds, torqueing his arms and legs in such a fashion so as to proximately inflict the injuries described in this Complaint.  In doing the acts or omissions hereinafter described, these certain DOE Defendants acted within the course and scope of their employment with Defendant COUNTY OF STANISLAUS, and acted under color of state law.  The individually named Defendants and certain DOE Defendants were Correctional Officers, Sheriff's Deputies, Sergeants, Captains, Lieutenants, or other Peace Officers and/or civilian employees and/or other agents of COUNTY.

14.     The Defendants named above and certain DOE DEFENDANTS are sued in their individual capacities.

15.     The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 6 through 50 are unknown to Plaintiff, who therefore sues said Defendants by said fictitious names.  Plaintiff will amend this Complaint to show said Defendants' true names and capacities when the same have been ascertained. Plaintiff is informed, believes, and thereon alleges that all Defendants sued herein as DOES are in some manner responsible for the acts, omissions, and injuries alleged herein.

16.     Plaintiff alleges, on information and belief, that each of the Defendants sued herein was wrongfully, deliberately indifferently, negligently, and/or otherwise responsible in some manner for the events and happenings as hereinafter described, and proximately caused injuries and damages to Plaintiff.  Further, one or more DOE Defendants was at all material times responsible for the hiring, training, supervision, and discipline of other defendants, including both individually named and to-be-identified DOE Defendants.

17.     Plaintiff is informed, believes, and thereon alleges that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator,

and/or alter ego of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of that relationship.  Plaintiff is further informed, believes, and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may hereinafter be otherwise, specifically alleged.  At all material times, each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, and/or tortious activity, resulting in the deprivation of Plaintiff's constitutional rights and other actionable harm.

18.     The acts and omissions of all Defendants were at all material times pursuant to the actual customs, policies, practices, and/or procedures of the COUNTY OF STANISLAUS and/or CFMG.

19.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

20.     A proper and timely tort claim was presented to the COUNTY OF STANISLAUS on behalf of Plaintiff, pursuant to Government Code § 910 et seq., and this action was thereafter timely filed within all applicable statutes of limitation.

21.     Proper and timely notice of Plaintiff's intent to file suit for medical negligence was served on CFMG, pursuant to Code of Civil Procedure § 364, and this action was thereafter timely filed within the applicable statute of limitations.

22.     This complaint is pleaded in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

## GENERAL ALLEGATIONS

23.     JEREMY LAPACHET is a 41-year old man, who entered the COUNTY OF STANISLAUS jail with the ability to walk, run, jog, and use all of his extremities freely; he left the jail in a stretcher, on or about October 26, 2015, a quadriplegic with grievous, life-altering injuries, including, but not limited to, severe spinal cord injuries, a skull fracture and subdural hematomas, a traumatic brain injury, and a torn rotator cuff, inter alia.

24.     On December 9, 2014, Plaintiff was booked into the COUNTY jail.  Sheriff ADAM CHRISTIANSON took custody of Mr. LAPACHET and he was held in the Stanislaus County Jail thereafter; he was housed at the Public Safety Center ("PSC") at the time he sustained grievous injuries, from which he was eventually transported to Doctors Medical Center hospital, in Modesto, on October 26, 2015.

25.     On October 24, 2015, at or around 5:50 p.m., Mr. Lapachet was placed in the "Sobering Cell" because COUNTY staff and CFMG staff became aware that he had been injected with and was under the influence of an unknown controlled substance.  Mr. Lapachet was **not** placed in a safety smock; he remained in regular clothing.  It was reported to CFMG Defendant JESSAMAE TRINIDAD, R.N. ("TRINIDAD"), that another inmate had injected Mr. Lapachet, the CFMG patient, with an unknown substance in his right "AC" (presumably the acromioclavicular joint); TRINIDAD noted three red marks in his right AC, with bruising present.  Mr. Lapachet reported that he had experience with the effects of various drugs when he was not in custody ("on the outside"), and that the substance he had been injected with did not feel like any he had ever ingested in the past.

26.     Prior to Mr. Lapachet's placement into the Sobering Cell, he also had been observed engaging in self-harming, suicidal behaviors, including assaulting himself by punching himself multiple times.  COUNTY jail staff reported this to CFMG staff.

27.     Less than an hour later, on October 24, 2015, at around 6:46 p.m., CFMG Defendant TABITHA KING ("KING"), a Licensed Vocational Nurse, documented an "Emergency Response," indicating she responded to a call for possible drug use.  Her report indicates COUNTY jail staff notified her that Mr. Lapachet had or had possibly ingested drugs while in the jail.  KING responded to the call by the correctional officers; CFMG Defendant LANI ANTONIO ("ANTONIO"), a Physician's Assistant, was also notified of this, either by KING or by COUNTY jail staff.  When KING arrived, she saw Mr. Lapachet sitting on a chair, with handcuffs on; his hands were trembling and he was restless.  His vital signs were taken at 6:46 p.m., on 10/24/15, and they indicated excessive elevation: 140/100 – blood pressure, heart

rate – 138 bpm.  Mr. Lapachet's pupils were dilated and non-reactive to light, a clear indicator of stimulant ingestion, such as methamphetamine, which should have been apparent to Defendants and which inferably could have been a component of the substance with which Mr. Lapachet had been injected.  Mr. Lapachet was in the "Sobering Cell" and supposedly was on "drug withdrawal monitoring." At about 6:53 p.m., Defendant ANTONIO directed merely that Mr. Lapachet's vital signs were to be monitored "Q6 hrs until stable[,]" i.e., every six hours. Given these circumstances and the risk of unknown, escalating effects from an unknown substance, and Plaintiff's elevated vital signs, both Defendants KING and ANTONIO should have ordered a toxicology screening test to determine what substance or substances Plaintiff had been injected with, and should have promptly requested and/or dispatched emergency medical care for Mr. Lapachet at this time, but failed to do so, with deliberate indifference to his serious medical needs.

28.     On October 24, 2015, at about 8:02 p.m., a Sobering Cell check was performed by CFMG Defendant JESSAMAE TRINIDAD, R.N. ("TRINIDAD").  TRINIDAD noted that Mr. Lapachet was touching his chest multiple times, pacing in his cell, and appeared very anxious and restless; he was complaining that his chest was "bigger than ever," and that his lungs and chest were retaining fluid.  Redness was noted on Mr. Lapachet's chest.  Yet, instead of immediately summoning emergency medical care, Mr. Lapachet was merely told by TRINIDAD, and/or others to "relax." TRINIDAD did not order a drug screening test, did not summon an ambulance, nor did she request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs.

29.     On October 24, 2015, at 11:46 p.m., the next Sobering Cell check was performed by CFMG Defendants JUDITH ALEJANDRE, L.V.N. ("ALEJANDRE") and VERONICA BERGHORST, R.N. ("BERGHORST"), which indicated that Mr. Lapachet's vital signs were still elevated: his blood pressure was 150/100 and his heart rate was 140 bpm. Despite these elevated vital signs, which had been elevated for at <u>least</u> 5+ hours at this point, in the context of a report that Mr. Lapachet had been injected with an unknown drug,

ALEJANDRE and BERGHORST still did not order or request permission to order a toxicology screening test, summon an ambulance or have Mr. Lapachet transported for emergency medical care, nor did they request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs.

30.     Defendant BERGHORST deemed Mr. Lapachet "stable" a little over five hours after being placed in a Sobering Cell, on October 24, 2015, at approximately 11:51 pm, even though his vital signs were still "**elevated**" at this time.  At that time, Defendant BERGHORST cleared Mr. Lapachet to be transferred to a regular, single occupancy cell, B132.  A later report by Lieutenant Gregg Clifton confirmed that "Lapachet was cleared from the Sobering Cell by medical and rehoused in Unit B132 by himself." However, Defendant BERGHORST wrote a report stating that Lapachet was "cleared from sobering cell by custody staff 10/24/15 at 2351. Placed on VS q6 hrs until stable."  On information and belief, Unit B132 was merely a single cell, which lacked the precautions "safety cells" generally have; it still had all the furniture and access to items that normal cells have – it was not a single cell that lacked any furniture (i.e., no sink, no bunk, no toilet) and had only a hole in the ground.  Additionally, Mr. Lapachet was not placed into a safety smock or other safety garment.  Despite having elevated vital signs, in the context of a report that Mr. Lapachet had been injected with an unknown drug, and in the context of posing a danger to himself, BERGHORST did not continue the obviously necessary, frequent (15-minute intervals) observation by custody staff of Mr. Lapachet in the Sobering Cell, did not order a toxicology screening test, did not summon an ambulance or have Mr. Lapachet transported for emergency medical care, nor did she request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs.

31.     CFMG personnel, including BERGHORST and ALEJANDRE, and COUNTY personnel knew and/or should have known Mr. Lapachet presented a serious danger to his own safety – in addition to being under the influence of an unknown substance, and in the context of a report by Mr. Lapachet that the substance was making him feel strange effects he had never

experienced before, which effects were manifesting through elevated vital signs, inter alia – because, prior to being allegedly placed alone in B132, he was **found to be hitting his head and face with his own fists**, as observed by both COUNTY jail personnel and as reported to – or observed by – CFMG personnel.

32.     On October 25, 2015, at 12:15 a.m., Mr. Lapachet was in Unit B132 and was supposed to be being monitored for "Drug Withdrawal" or the effects of the substance; CFMG staff knew and COUNTY jail staff knew Mr. Lapachet was under the influence of an unknown substance.

33.     At 5:01 a.m., on October 25, 2015, Mr. Lapachet's vital signs were checked again, which indicated the elevated levels of: a blood pressure of 162/98 and a heart rate of 140 bpm; it is not clear whether his pupils were re-checked at this time, despite the fact they previously were non-reactive to light and were dilated.  CFMG Defendant BERGHORST's 5:45 a.m. note states that Mr. Lapachet related to the CFMG medical staff at this time that "people were going to get him in his cell." No further treatment was rendered, other than to "encourage fluids." BERGHORST's notes indicate that Mr. Lapachet was "under the influence of unknown substance" and that his vital signs were **elevated** when he was cleared from the sobering cell.  Despite Mr. Lapachet's excessively elevated vital signs, which had been elevated for at least nearly 10+ hours at this point, in the context of a report that Mr. Lapachet had been injected with an unknown drug, and in the context of Mr. Lapachet engaging in self-mutilating/self-harming behavior, BERGHORST still did not order a toxicology screening test, did not summon an ambulance or have Mr. Lapachet transported for emergency medical care, nor did she request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs.

34.     At 9:08 a.m., on October 25, 2015, CFMG R.N. Varinder Sablok apparently tried to perform a "Drug Withdrawal" monitoring evaluation (which apparently consists only of a vital signs check), but the note indicates that it was not performed because the "patient was not in unit." On information and belief, COUNTY staff had removed Mr. Lapachet or

otherwise had negligently or wrongfully prevented this monitoring from occurring and should have enabled it by cooperating with or assisting CFMG staff.  CFMG R.N. Sablok inferably did not look for Mr. Lapachet or inquire with COUNTY staff to enable the evaluation; he abandoned this check without any follow-up.  Sablok did not request or institute any increased supervision or treatment plan for him, with deliberate indifference to his serious medical needs.

35.     At about 4:00 p.m., on October 25, 2015, CFMG Defendant AMARDEEP TAWANA, L.V.N. ("TAWANA"), conducted a check on Mr. Lapachet, in order to monitor the effects of the substance both CFMG and COUNTY knew he had ingested, and TAWANA and other CFMG and COUNTY staff observed him standing beside the wall in his cell, with a towel tightly tied around his left wrist.  TAWANA asked the COUNTY custody staff, on information and belief Defendants DEOL, TORRES and SERGANT HUSMAN, to open up the door to Plaintiff's cell for a vital signs check, but the COUNTY custody staff refused to do so. TAWANA and possibly other CFMG medical staff told the COUNTY custody staff that Mr. Lapachet, their patient, "doesn't look right," and again requested access to Mr. Lapachet to check his vital signs, but the COUNTY custody staff (believed to be Defendants DEOL, TORRES and SERGANT HUSMAN) allegedly refused, again.  CFMG staff, including TAWANA, related their concern to COUNTY staff (believed to be Defendants DEOL, TORRES and SERGANT HUSMAN) about the towel that was tightly tied around Mr. Lapachet's left wrist, but this concern was disregarded and downplayed by the COUNTY custody staff who told TAWANA that Lapachet "has been doing that since morning and it's not new."  CFMG staff and COUNTY jail staff observed Mr. Lapachet standing on the door, talking to himself, and smiling.  CFMG staff, including TAWANA, and COUNTY staff, with deliberate indifference, failed to order a toxicology screening test, failed to immediately summon medical care or to have him admitted for psychiatric observation, failed to have him transported to the emergency room, and did not request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs. Defendants DEOL, TORRES and SERGANT HUSMAN, who together were responsible to

monitor and care for LAPACHET, with deliberate indifference to Mr. LAPACHET'S serious medical needs and safety, failed to properly require and conduct observation rounds at fifteen-minute intervals, failed to move LAPACHET to a true safety cell for his own safety and protection, failed to provide the observation and care LAPACHET obviously needed, and delayed, denied, and withheld necessary medical care for LAPACHET'S obvious medical needs. Sometime between 4:00 pm and 5:35 pm, Mr. LAPACHET was severely and gravely injured, including spinal fractures that would ultimately render him paralyzed.

36.     At about 5:35 p.m., on October 25, 2015, Defendant DEOL summoned CFMG staff, including Defendant TAWANA, for a "man down" because Mr. Lapachet was laying on the ground and was bleeding from his nose and the right, upper side of his head; this was the next time that a Drug Withdrawal Monitoring evaluation, or any checkup for that matter, was performed. Both CFMG and COUNTY staff, including Defendant CORRECTIONS DEPUTIES H. DEOL, A. TORRES, D. MARTINEZ, GALLO, SERGEANT HUSMAN, were present. At about 5:50 pm, on October 25, 2015, CFMG Defendant TAWANA observed Mr. Lapachet in B132, and noted that he was without a safety garment. TAWANA claimed Mr. Lapachet was resistant to following directions. Also, self-mutilating injuries were observed, and **Mr. Lapachet had just been found with towels wrapped around his body again,** this time wrapping towels **around his neck and both hands**. COUNTY and CFMG personnel, including TAWANA, noted blood on Mr. Lapachet's mouth, his hands, and blood smeared on his forehead. Defendant GALLO later told Sergeant Kjellberg that at that time, Lapachet "could not stand on his own." Although Mr. Lapachet was bleeding from his nose and the upper side of his head, *and could not stand on his own*, Defendant TAWANA minimized the gravity of his condition and failed to conduct a complete evaluation or summon medical care, noting that there were "no visible injuries." This indicates TAWANA, an L.V.N., obviously was neither qualified nor competent to render any care. Her conduct clearly fell below the applicable standard of care for this and numerous other reasons. And, instead of immediately summoning medical care and further evaluating Mr. Lapachet's condition, or transporting him

to the emergency room to be seen by trauma doctors, given that he was bleeding from his nose and head and could not stand, Defendant TAWANA simply noted that, since he was currently being "monitored due to unknown substance abuse," they would "continue to monitor" him, which apparently consisted merely of attempting to check his vital signs every six hours. CFMG and COUNTY staff, including TAWANA, DEOL, TORRES, MARTINEZ, GALLO, and HUSMAN, knew that Mr. Lapachet had been placed in the Sobering Cell due to ingestion of an unknown drug and signs of suicide and depression, including his infliction of self mutilating injuries on his body, that he posed a risk to his own safety and was under the influence of an unknown substance, and that he was now bloody and could not walk, but did not order a toxicology screening test, and did not summon more competent medical care or transfer his care to the emergency room, nor did the Defendants request or institute any increased supervision, monitoring, or treatment plan for him, all with deliberate indifference to his serious medical needs.

37.     By now, it was clear to Defendants, including TAWANA and corrections deputies DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN, that Mr. Lapachet could not move his legs at all, and could not move his arms normally.  No Defendant summoned the emergency medical care that Mr. Lapachet desperately needed.  The CFMG employees and Defendants who responded, including TAWANA, LVN, did not transfer Plaintiff to a hospital or call an ambulance, but rather conducted an on-site response.  Plaintiff is informed, believes, and thereon alleges that the contract between CFMG and Defendant COUNTY created a financial incentive for CFMG to refrain from sending Mr. Lapachet and other inmates in need of inpatient hospitalization or other intensive care off-site for their needed care.  Defendant TAWANA, LVN, cleared Mr. Lapachet to remain at the jail, rather than be taken to a hospital.

38.     On information and belief, at approximately 6:00 pm, Defendant SERGEANT HUSMAN ordered that Lapachet be moved to a Safety Cell, B102.  Despite his clear injuries, and in the presence of LVN TAWANA, COUNTY jail correctional deputies DEOL, TORRES,

MARTINEZ, GALLO, and SERGEANT HUSMAN violently dragged Mr. Lapachet out of cell B132, because Mr. Lapachet could not walk, while Mr. Lapachet repeatedly said, "I have a neck injury, easy, easy."  When COUNTY correctional officers had dragged Mr. Lapachet, he told them they were hurting him.  Defendant HUSMAN later falsely claimed in a report that Lapachet's "head/upper body were supported and carried," but jail video disproves that; Defendants dragged him across the floor by his wrists and arms while his head and neck flopped without any support.

39.     Once inside the safety cell, Defendants DEOL, TORRES, MARTINEZ, and GALLO turned LAPACHET over onto his stomach, while SERGEANT HUSMAN watched and directed them.  Without any movement or resistance whatsoever from LAPACHET, Defendants DEOL and GALLO painfully pinned LAPACHET's shoulders to the ground using pain compliance pressure holds on both of LAPACHET's wrists, arms, and shoulders.  At the same time, Defendant MARTINEZ needlessly placed LAPACHET's paralyzed legs into a "figure 4" pain compliance hold.  Defendant TORRES cut off LAPACHET's jumpsuit. LAPACHET never resisted in any way, because he could not – he was already paralyzed.  All of the force used against LAPACHET when he was paralyzed was clearly unjustified.

40.     All of the uses of force by Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN, including dragging LAPACHET and placing LAPACHET into contortions and pain compliance holds, were unnecessary and wanton inflictions of pain and injury.  Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN knowingly subjected LAPACHET to a substantial risk of physical harm and unnecessary pain. On information and belief, these unnecessary and wanton inflictions of pain and injury by Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN, including by dragging and placing LAPACHET into contortions and pain compliance holds, were done with deliberate indifference to LAPACHET's obvious and serious medical needs, and caused greater injury to LAPACHET's spinal cord.  Further, Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN were each integral participants and

fundamentally involved in all uses of force, providing backup and support to each other.  None of Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN intervened in each other's unlawful uses of force and deliberate indifference to LAPACHET's serious medical needs, despite the feasibility of such intervention for the protection of Mr. LAPACHET.  Neither did Defendant LVN TAWANA, who stood and watched these outrageous and totally unnecessary uses of force on a gravely injured man.

41.    After cutting off Mr. LAPACHET's jumpsuit, Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN left LAPACHET laying prone, face-down, naked, and paralyzed.  As Defendants discontinued their pain compliance holds, LAPACHET's arms and legs can be seen on video falling limply to the ground.  Defendants left Mr. LAPACHET laying in that position with deliberate indifference to his serious, emergency medical needs.

42.    Defendants LEE and GALLO now were responsible to regularly conduct logged observations of Mr. Lapachet in the Safety Cell twice every thirty minutes, for Mr. Lapachet's safety due to his known self-harming behavior and injuries.  From the time of Mr. Lapachet's forceful placement in the Safety Cell at approximately 6:00 pm on October 25 to 12:27 am, October 26, Deputy LEE shined a flashlight into Lapachet's safety cell 21 times, according to the jail log; and, Deputy GALLO shined a flashlight into Lapachet's safety cell 5 times, according to the jail log.  Other than to accompany Defendant TAWANA into the cell at approximately 6:58 pm, Defendants LEE and GALLO never even attempted to go into the Safety Cell to check on Lapachet, who was immobile.  At times, Lapachet could be seen helplessly trying, but unable, to get up using his arms.  During that entire period, Defendants LEE and GALLO saw that Lapachet continued to lie face-down in the same position in which they had left him on the floor of the cell.  Eventually, a pool of urine and blood collected under Mr. Lapachet's body and face.  Neither LEE nor GALLO called for medical attention or alerted anyone of Lapachet's failure to get up or move any part of his body, except for slight movement of his arms and head.

43.     Despite the fact Lapachet had obvious and potentially self-inflicted, catastrophic injuries requiring emergency medical care, CFMG Defendant TAWANA did not request or institute any emergency care or hospitalization, with deliberate indifference to his serious medical needs.  The only action TAWANA apparently might have taken was to schedule a mental health "evaluation" to be conducted the **next morning**, but there is no indication that this ever even took place, despite its gross inadequacy in the first place.  CFMG staff, including TAWANA, DEVENDRA, and others, and COUNTY staff, with deliberate indifference, failed to order a toxicology screening test, failed to immediately summon medical care or to have him admitted for psychiatric observation, failed to have him transported to the emergency room, and did not request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs.

44.     The mental health RN for CFMG, Defendant GRASHIKA DEVENDRA, a Psychiatric R.N. ("DEVENDRA"), was notified at 6:10 pm on October 25, 2015, but, on information and belief, no follow-up by Defendant DEVENDRA was ever done, and no further rounds were performed by DEVENDRA in order to evaluate and monitor Mr. Lapachet. CFMG Defendants TAWANA and DEVENDRA failed to immediately summon medical care or to have him admitted for psychiatric observation, failed to have him transported to the emergency room, and did not request or institute any increased supervision or treatment plan for him, all with deliberate indifference to his serious medical needs.

45.     On October 25, 2015, at about 6:58 p.m., during a second "Suicide Watch" of Mr. Lapachet in the Safety Cell, Defendant TAWANA re-entered the Safety Cell with Defendants LEE, GALLO, and Sgt. Kjellberg.  Defendants LEE, GALLO, and another unidentified deputy placed Lapachet in totally unnecessary shoulder pins and placed his legs in a "figure 4" pain compliance hold again.  Given Plaintiff's total paralysis of his legs, and partial paralysis of his arms, and his complete lack of any resistance, these unnecessary uses of force were unlawful under the Eighth Amendment.  Defendants GALLO and LEE must have felt Mr. Lapachet's limp and weakened limbs.  Defendant TAWANA observed that Mr. Lapachet was

still without a safety garment, was "still laying on the floor," *had not moved from the position to which he had been dragged and left*, and had dried blood on his face and nose.  At this time, Defendants TAWANA, LEE and GALLO still did not request or institute any increased supervision or treatment plan for him, and did not seek emergency medical treatment, with deliberate indifference to his serious medical needs.  Again, CFMG employee TAWANA did not have him transferred to a hospital or call an ambulance, but rather conducted an on-site response; on information and belief, this was due, at least in part, to the contractual incentive for CFMG to refrain from sending Mr. Lapachet off-site for inpatient hospitalization because that would cost more money, as well as the policies, procedures, habits, and customs of CFMG and COUNTY, as well as the lack or inadequacy thereof.

46.    On October 25, 2015, at 11:02 p.m., Defendant TAWANA looked into the cell and noted that Mr. Lapachet was still laying flat, in the same place on the floor.  TAWANA apparently scheduled a mental health evaluation for the next morning (the notation indicates "MH eval sche'd next morning"), but, with deliberate indifference to Mr. Lapachet's serious medical needs, there is no indication that this was ever scheduled and, apparently, this appointment or mental health evaluation was never conducted.  Furthermore, TAWANA did not request or institute any increased supervision or treatment plan for Mr. Lapachet, with deliberate indifference to his serious medical needs, and, if she did, she failed to follow-through and execute any such plan.

47.    At approximately 11:00 pm, on October 25, 2016, Defendant TAWANA ended her work shift and was replaced by Defendant BERGHORST, R.N.  Defendant TAWANA briefed Defendant BERGHORST on the night's events involving Mr. Lapachet.  On information and belief, despite the acuteness and gravity of Mr. Lapachet's injuries, and the shocking nature of the night's events, Defendant BERGHORST made no attempt to examine or check on Mr. Lapachet.

48.    On October 26, at 12:27 am, Defendant GALLO observed Mr. Lapachet still laying face down in the same position he had repeatedly observed him in for almost seven

hours.  Mr. Lapachet now had a pool of yellow liquid with brown spots under his face and body.  This liquid was later found to be urine and blood.  Defendant GALLO finally called his supervisor and requested a medical check.

49.     On October 26, 2015, a cryptic Suicide Watch Report monitoring note by BERGHORST, ostensibly reported at about **12:40 a.m.**, states that Mr. Lapachet was "found laying" in the "prone position" and that, per the COUNTY custody staff, the patient (Mr. Lapachet) **had "not moved since he was placed in [the] safety cell."**  Mr. Lapachet was noted to be "cooperative" at this time, but his respirations were labored, and his oxygen saturation and pulse were low.  Defendant BERGHORST responded to Mr. Lapachet's cell, along with other CFMG personnel, when, during a safety cell "assessment," Mr. Lapachet was **found *laying prone with liquid pooled around his face and upper body*.**  The liquid was **yellow with spots of dark brown coffee ground appearance in the center**.  When Mr. Lapachet was found lying facedown in his cell, there was a sizeable boot mark and deep tissue injury on his rear end.  Mr. Lapachet also told Defendant BERGHORST and others that he could not move his legs.

50.     Defendant BERGHORST indicated that Mr. Lapachet was laying flat and was heard talking; his airway and respirations **were irregular** and **shallow**.  An examination of his mouth and throat revealed the presence of blood, and dried blood was observed around his nose and mouth.  Mr. Lapachet was removed from his cell by COUNTY correctional officers and placed in a sitting position against the cell door.  Mr. Lapachet reported that his neck was hurting.  He was placed in a C-collar.  Defendant BERGHORST requested that the COUNTY Sergeant on duty call for American Medical Response ("AMR"), at 12:49 am.  BERGHORST characterized Mr. Lapachet as being "alert" the entire time and "oriented to name," but Mr. Lapachet stated he was in the San Joaquin County Jail when asked where he was, and he did not remember being placed in the "Safety Cell," which, on information and belief, was merely a single cell.

51.    Defendant BERGHORST characterized Mr. Lapachet as "alert," but "not moving." CFMG Defendants BERGHORST, ALEJANDRE, and Robin Mehring, LVN, were present; RN BERGHORST misleadingly characterized the history that led up to this emergency response as being that Mr. Lapachet had been placed in the "sobering cell" on 10/24/15 and then was placed on "drug W/D monitoring" until stable, on 10/25/15, at approximately 0000, completely omitting mention of his previous placement in cell B132 (i.e., the single cell, that has been erroneously referred to in jail records as a "safety cell") after being found to be a danger to himself for engaging in self-mutilating and self-harming behaviors.

52.    AMR was called at 12:52 and the EMS personnel arrived at Mr. Lapachet's side at about 12:59 a.m.  AMR was informed that Mr. Lapachet had been "brought over" to the observation cell after he was found "hitting himself," which occurred after he had possibly ingested 2-3 dime bags of "dope."  AMR was told that, during "rounds," the COUNTY staff had found Mr. Lapachet lying face down in a pool of blood and other bodily fluids.  Mr. Lapachet at that time was able to state that he "hurt all over," but he had mumbled speech and was slow to respond.  Nonetheless, the COUNTY staff had then dragged Mr. Lapachet out of his cell, and then CFMG medical staff was called "for evaluation."  Mr. Lapachet was placed in a C-collar and then EMS (AMR) was called.

53.    Mr. Lapachet was placed into full spine precautions and was taken to the emergency room from the COUNTY jail (PSC), at about 1:23 a.m., by AMR, and arrived at the Doctors Medical Center hospital at 1:39 a.m.

54.    Prior to being placed in a regular cell, B132, LAPACHET was found to be hitting his head and face with his own fists, as observed by both COUNTY jail personnel and as reported to – and/or observed by – CFMG personnel; after being placed in B132 without a safety garment, such as a safety smock, he continued to assault himself, as observed by the COUNTY jail personnel and observed by – or inferably reported to – CFMG personnel.  There was a bunk in the cell, but no other inmates.  In violation of generally accepted jail standards that have been in place for several years and which were in place prior to the events described

herein, COUNTY placed Plaintiff in a cell with bunk beds – a height from which a disturbed individual that posed a danger to themselves could jump – and Plaintiff was provided regular clothing, linen, bed, a table, sink, and toilet.  It was not a padded cell, nor was it an empty cell with nothing more than a toilet hole in the floor, but Plaintiff was alone inside of it.

55.     COUNTY jail staff had allegedly found Mr. Lapachet punching himself in the head repeatedly, both before and after he was placed in B132, but he was permitted to keep doing so by the COUNTY jail staff and CFMG staff, since they had not placed him in a safety garment, nor had they otherwise restricted his ability to inflict harm to himself by, for e.g., placing him in a real safety cell that had no furniture or heights.

56.     After being admitted to the hospital and undergoing various diagnostic testing, it was learned that Mr. Lapachet had sustained grievous and permanent injuries, including, but not limited to, the following:

a. He was unable to feel or move his legs: he had no purposeful movements or sensation in his lower extremities;
b. Cervical Spine fracture at C5 with a variety of severe spinal cord injuries;
c. Right-sided epidural hematoma with 3 mm midline shift;
d. Subdural hematomas;
e. Bilateral subdural hematoma;
f. Nondepressed skull fracture;
g. Right sphenoid wing fracture; fracture along coronal suture;
h. Various fractures in the skull and surrounding areas, and epidural hematoma with mass effects of the adjacent brain and 3-mm midline shift;
i. Displaced right frontotemporal skull fracture with associated epidural hematoma;
j. Nondisplaced fracture along left side of coronal suture;
k. Extra-axial hematoma along the left frontoparietal lobe;
l. Left sided facial hematoma;
m. The procedures his injuries required included, but were not limited to: right frontotemporal craniotomy and evacuation of right frontotemporal extradural hematoma and repair of simple cranial fracture;
   i. Right frontotemporal craniotomy;
   ii. Evacuation of epidural hematoma;
   iii. Repair of right frontotemporal nondepressed skull fracture;
n. Torn rotator cuff on his Right shoulder;
o. In Summary:
   i. Quadriplegia; traumatic cervical spinal cord injury;
   ii. Skull fractures;
   iii. Torn rotator cuff;

iv.   Traumatic brain injury;

p.   Permanent Paralysis; Mr. Lapachet is now a Quadriplegic.

57.     As set forth above, Defendant COUNTY contracts with Defendants CFMG and FITHIAN to provide medical and mental health care for all inmates in COUNTY jails. Defendant FITHIAN is a Board Certified psychiatrist, and oversees the delivery of all medical, dental, and psychiatric care in all facilities CFMG serves.  He also provides telepsychiatry services for Defendant COUNTY, as an employee, director, and managing agent of Defendant CFMG.

58.     On information and belief, the amount of medical care CFMG is contracted to provide to COUNTY is grossly inadequate for the medical needs of the number of jail inmates in COUNTY's facilities, and constitutes a policy of the COUNTY and CFMG of deliberate indifference to the serious medical/psychiatric needs of inmates at COUNTY OF STANISLAUS facilities.  Policymaking officials and other officials for COUNTY knew at all relevant times prior to the events giving rise to this suit that the number of individuals housed in COUNTY jails who were in need of mental health services overwhelmed the services that COUNTY and CFMG was capable of providing, and that the COUNTY and CFMG staff was grossly insufficient to provide the proper level of care for the population of inmates that had mental illnesses or who were suffering from mental illnesses.

59.     The United States Department of Justice has found that approximately 64% of jail inmates suffer from mental health problems.  The COUNTY and CFMG knowingly, and with deliberate indifference to the serious medical/psychiatric needs of inmates, contracted to provide inadequate psychiatric care to inmates within the COUNTY'S jails.

60.     On information and belief, the COUNTY knew or should have known that the medical and mental health staffing that CFMG provided and provides was inadequate for the COUNTY's corrections program operations.  Yet, Plaintiff is informed, believes, and thereon alleges that neither the COUNTY nor CFMG took appropriate steps to rectify their inadequate medical and mental health staffing.

61.     CFMG is the largest private provider of correctional healthcare in the State of California, stating on its website that it currently has contracts covering 67 facilities with an average daily population of 16,000 inmates.  CFMG currently has contracts to provide health care services in numerous counties in the Northern District of California, including Monterey County, Lake County, Mendocino County, Humboldt County, Sonoma County, Napa County, San Benito County, and Santa Cruz County.

62.     CFMG has been widely criticized for its inadequate health care provided to inmates throughout the State of California.  CFMG holds itself and its officers, directors, and managing agents out as experts in the field of correctional health care.  Yet, jail facilities served by CFMG have a 50% higher rate of death by suicide or drug overdose than non-CFMG facilities.  Plaintiff is informed and believes that, throughout California, CFMG and FITHIAN have a policy and/or practice of providing unqualified, incompetent, and insufficiently licensed medical staff.  Plaintiff is informed and believes that in this case, CFMG and FITHIAN knew generally accepted standards required that their mental health services in the COUNTY jail facilities be staffed with psychiatrists, psychologists, licensed clinical social workers and other licensed therapists, and that if they staffed their mental health services with registered nurses, those registered nurses were required to have advanced postgraduate mental health education and work under the supervision of a higher level caregiver, such as a physician, at all times. With deliberate indifference to the serious medical needs of patients, Defendants staffed their mental health services at COUNTY jail with insufficiently credentialed, unqualified caregivers.

63.     While in the custody of COUNTY and Sheriff CHRISTIANSON in their Jail, and under the care of COUNTY and CFMG, Mr. LAPACHET began suffering from a serious, but treatable, reaction to a controlled substance and/or a mental illness and manifesting such reaction/illness with his words and conduct; his condition worsened, he began to engage in self-harming behaviors, and due to the deliberate indifference of COUNTY jail staff, his condition and the effects escalated, leading to Mr. Lapachet's grievous and life-altering injuries.  Mr. Lapachet was allowed access to and ingested drugs of an unknown origin and type, he suffered

ill effects from these drugs, including, but not limited to, a severe reaction or mental illness, he potentially suffered from a drug-induced state of psychosis, he suffered from a mental health illness, he possibly became suicidal, and clearly became a danger to himself.

64.    However, neither DR. FITHIAN nor any CFMG Defendant, nor any other CFMG nurse or employee, nor any COUNTY employee, at any point ever ordered a toxicology screening test, had Mr. Lapachet admitted to the hospital or to an inpatient mental health facility, and none of the above-referenced individuals ever created, requested, or instituted an appropriate or adequate treatment plan for Mr. Lapachet, as required by generally accepted standards for care of individuals in Mr. Lapachet's circumstances and, in general, the mentally ill in jails.

65.    At no time during Mr. Lapachet's entire incarceration did Defendant FITHIAN, or any other CFMG Defendant, or any other CFMG employee or COUNTY employee, ever create an appropriate treatment plan for MR. LAPACHET, or provide appropriate care, observation and housing for Mr. Lapachet, all with deliberate indifference to Plaintiff's serious medical needs.

66.    During the entire time that Plaintiff was under observation for possible drug overdose and was under suicide watch – or under watch for otherwise posing a danger to himself – in COUNTY's jail, neither the COUNTY nor CFMG, nor their employees or agents, ever ordered a toxicology screening test, provided the required treatment plan, or ordered/directed/effected even a single in-person examination by a licensed physician, psychiatrist, or psychologist, despite Mr. Lapachet's obvious and serious medical and mental health needs.

67.    On information and belief, Mr. Lapachet's grievous injuries were caused by one or both of the following alternative reasons, which are pleaded in the alternative per Rule 8(d)(2) of the Federal Rules of Civil Procedure:

a. All named Defendants, with deliberate indifference to Mr. Lapachet's serious medical needs and risk of harm, failed to order, summon, and/or provide necessary medical care for him;

b. Defendant BERGHORST and/or other CFMG and COUNTY Defendants decided and/or ordered that Mr. Lapachet be moved from the "sobering cell," with high visibility to jail staff, to a single cell, B132, without good visibility to jail staff, without the necessary and frequent cell checks that Mr. Lapachet's serious medical needs obviously required, and with furniture and structural dangers with which Mr. Lapachet could, and may have, hurt himself;

c. Defendants DEOL, TORRES, and HUSMAN, with deliberate indifference to Mr. Lapachet's serious medical needs and risk of harm, failed to order and/or conduct the necessary, required frequent observation checks on Mr. Lapachet, such that he was permitted to be gravely injured when he was in the single cell, either by himself or others.

d. Defendants DEOL, TORRES, MARTINEZ, GALLO, and SERGEANT HUSMAN used, and permitted the use of, wanton and unnecessary force on Mr. Lapachet after he was already paralyzed, causing him further serious pain and injury;

e. Defendants LEE and GALLO, with deliberate indifference to Mr. Lapachet's serious medical needs and risk of harm, failed to conduct the necessary, required frequent observation checks on Mr. Lapachet, and when they did check, they ignored Mr. Lapachet's obvious medical distress and inability to move, while Mr. Lapachet needlessly suffered and was deprived of necessary emergency medical treatment.

f. All Defendants remained deliberately indifferent to Mr. Lapachet's serious medical needs as he was allowed to lay in a pool of his own urine and blood, naked, face down, and paralyzed on the cold, hard floor for almost seven hours,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

while Mr. Lapachet was in need of emergency medical care for his serious and obvious medical needs;

g.   Through other means described herein;

h.   Both the COUNTY and CFMG failed to protect Mr. Lapachet from suffering the grievous injuries that he suffered at the hands of correctional officers or other individuals.

68.   Between October 24, 2015 and the time he was taken out on a stretcher by AMR personnel from the COUNTY's jail to the emergency room, Mr. LAPACHET's condition progressively worsened while he remained in COUNTY's jail, being subjected to deliberately indifferent and/or negligent care in COUNTY's jail, with no examination by a physician or substance abuse specialist, no chemical evaluation concerning the substance he had ingested, no psychiatric treatment, no mental health treatment or evaluation, no treatment plan, no appropriate observation, and no emergency medical care when he became gravely physically injured, as required by generally accepted standards for health care in jails, in blatant violation of applicable standards of care.  At no time did Defendants, their agents, or employees ever request a blood test or other test to determine what substance Plaintiff had been injected with in order to conduct a proper assessment, nor did they obtain a consultation by any licensed mental health care provider, nor did they require that he be under constant observation or provided twice every thirty minute checks – as state and national standards require, nor did they make sure he had a safety smock while in the safety cell, nor did they arrange for his transfer to the hospital for emergency medical and mental health care.

69.   Plaintiff is informed, believes, and thereon alleges that at no time when Mr. Lapachet was in a lockdown or segregated cell (B132) did any Defendant COUNTY or CFMG employee or agent ever provide him with the constant observation required by generally accepted procedures for the housing of a potentially suicidal inmate, or an inmate that otherwise poses a danger to themselves.

70.     All Defendants' deliberate indifference to Mr. Lapachet's serious medical needs and Defendants' other tortious, unconstitutional, and/or otherwise wrongful conduct caused Mr. Lapachet's injuries.

71.     While Mr. Lapachet was incarcerated in COUNTY's jail, the individually named Defendants and DOES 7-50, including, but not limited to, Defendants DEOL, TORRES, MARTINEZ, GALLO, LEE, and SERGEANT HUSMAN, jail administrators, medical personnel, and/or other law enforcement officers, TAYLOR FITHIAN, M.D., LANI ANTONIO, P.A., VERONICA BERGHORST, R.N., JESSAMAE TRINIDAD, R.N., GRASHIKA DEVENDRA, Psychiatric R.N., TABITHA KING, L.V.N., AMARDEEP TAWANA, L.V.N., JUDITH ALEJANDRE, L.V.N., and/or other COUNTY, and/or CFMG employees knew and/or had reason to know that Mr. Lapachet had ingested a controlled substance, was having a reaction to this unknown substance, had unstable and elevated vital signs, was acting strange, and had repeatedly engaged in self-mutilation and self-harming behaviors in the days and hours prior to him being found face down in his cell and, as such, knew Mr. LAPACHET was at a serious risk; they knew and/or had reason to know that Mr. Lapachet was an ill and/or mentally ill and/or emotionally disturbed person, with immediate and serious medical needs.  Despite knowing all of the foregoing, Defendants were deliberately indifferent to Mr. LAPACHET's immediate and serious medical needs.

72.     The individually named Defendants, other COUNTY jail and medical personnel, and DOES 7-50 failed to properly and appropriately assess and classify Mr. Lapachet and failed to properly assess and classify his serious medical needs.

73.     Additionally, Defendant BERGHORST and the COUNTY Defendants failed to advise, require, or provide safe and adequate housing for Mr. Lapachet, with deliberate indifference to his rights and serious medical needs, by housing him in an environment that was unsafe for a person under the influence of drugs, and/or was engaging self-harming, and/or was a suicidal person, failing to provide him with a safety smock and safety bedding, as well as providing or failing to remove attachments or furniture Mr. Lapachet possibly used to harm

himself, and failing to observe and check on Mr. Lapachet's welfare as required by law and regulations.

74.     The Defendants' actions and omissions and the manner and duration in which Mr. Lapachet was incarcerated without adequate medical care was contrary to generally accepted practices and jail procedures, causing the injuries of Mr. Lapachet.

75.     At all material times and, alternatively, the actions and omissions of each Defendant were intentional, and/or wanton and/or willful, and/or conscious shocking, and/or reckless, and/or callous, and/or malicious, and/or deliberately indifferent to Plaintiff's rights, and/or grossly negligent, and/or negligent.

76.     As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, Plaintiff, JEREMY LAPACHET, sustained the following injuries and damages, past and future, including, but not limited to:

a.  Economic damages, including, but not limited to, out of pocket expenses, ambulance, hospital, and medical expenses, and a life-care plan;
b.  Lost wages and earning capacity;
c.  Extreme physical pain and suffering;
d.  Permanent disabilities, including quadriplegia, requiring extensive lifetime medical care, rehabilitation, and assistance with all activities of daily living, inter alia;
e.  Emotional distress, fear, anxiety, sleeplessness, humiliation, indignity, and loss of liberty;
f.  Loss of enjoyment of life and pain and suffering;
g.  All other legally cognizable special and general damages;
h.  Violations of state and federal constitutional rights; and,
i.  All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, California Civil Code § 52, California Code of Civil Procedure §1021.5, and as otherwise allowed under California and United States statutes, codes, and common law.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983)**
**"DELIBERATE INDIFFERENCE TO MEDICAL NEEDS"**
**PLAINTIFF AGAINST DEFENDANTS FITHIAN, ANTONIO, BERGHORST,**
**TRINIDAD, DEVENDRA, KING, TAWANA, ALEJANDRE, DEOL, TORRES,**
**MARTINEZ, GALLO, LEE, HUSMAN AND DOES 7-20**

77.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth here.

78.     By the actions and omissions described above, the Defendants named above in this cause of action, acting under the color of state law in their individual capacities, deprived Plaintiff of the rights, privileges, and immunities secured by the Eighth Amendment by subjecting him, or through their deliberate indifference, allowing others to subject him, to delay and denial of access to medical or mental health care for a serious, but treatable, medical and/or or mental health condition.

79.     The listed Defendants knew that Mr. LAPACHET's medical condition was serious, but treatable, and knew or must have known that he required access and delivery to urgently needed medical/mental health care; Defendants further had a duty to provide LAPACHET reasonable security and safe, appropriate housing and monitoring to protect him from harm and to accommodate his mental health and medical conditions.

80.     The listed Defendants knew or must have known that he was suffering from serious, but treatable, medical and mental health conditions, which Defendants knew or must have known that, if not treated, would worsen and cause LAPACHET serious harm, permanent injuries, or death.

81.     The listed Defendants ignored, delayed, or denied to LAPACHET urgently needed medical and psychiatric care and treatment.  As a result of the Defendants' deliberate indifference to both LAPACHET's need for medical care and treatment and his mental condition, Plaintiff suffered damages and a deprivation of constitutional rights, as described herein.

82.     By the actions and omissions described above, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiff of the following well-settled constitutional rights that are protected by the Eighth Amendment to the U.S. Constitution:

      a.   The right to be free from deliberate indifference to LAPACHET's serious medical needs while in custody and confined in jail, as secured by the Eighth Amendment;

83.     The listed Defendants' failure to intervene, prevent, or stop the constitutional violations by others, when Defendants were in a position to so intervene when such violations were occurring, also renders such Defendant(s) liable for these violations.

84.     Defendants subjected Plaintiff to their wrongful conduct, depriving Plaintiff of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff would be violated by their acts and/or omissions.

85.     As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiff sustained injuries and damages, as set forth above, in ¶ 76.  Plaintiff is therefore entitled to general and compensatory damages in an amount to be proven at trial.

86.     In committing the acts alleged above, the individually named Defendants and DOE Defendants acted maliciously and/or were guilty of a wanton and reckless disregard for the rights, safety, and emotional well being of Plaintiff, and by reason thereof, Plaintiff is entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983 and other state and federal law against these individual Defendants and Defendant CFMG; no punitive damages are sought directly against the COUNTY.

87.     Plaintiff is also entitled to reasonable costs and attorney's fees under 42 U.S.C. § 1988, California Code of Civil Procedure § 1021.5, and other applicable California codes and laws.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983)
### "UNLAWFUL USES OF FORCE"
### PLAINTIFF AGAINST DEOL, TORRES, MARTINEZ, GALLO, LEE, HUSMAN AND DOES 7-50

88.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth here.

89.     By the actions and omissions described above, the above-named Defendants violated 42 U.S.C. § 1983, depriving Plaintiff of the following well-settled constitutional rights that are protected by the Eighth Amendment to the U.S. Constitution:

a.  The right to be free from the unnecessary and wanton infliction of pain and injury that constitutes cruel and unusual punishment, as secured by the Eight Amendment;

90.     The failure to intervene, prevent, or stop the Eighth Amendment violations on the part of above-named Defendants, who were in a position to do so when such violations occurred, renders such Defendants liable for these violations.

91.     Defendant Husman and any other supervisors who failed to prevent the unconstitutional acts of said Defendants done in their presence, and who failed to properly supervise them, also are liable directly and in their capacity as a supervisor.

92.     As a proximate result of the foregoing wrongful acts and/or omissions, Plaintiff sustained injuries and damages, as set forth above, in ¶ 76.  Plaintiff is therefore entitled to general and compensatory damages in an amount to be proven at trial.

93.     In committing the acts alleged above, Defendants DEOL, TORRES, MARTINEZ, GALLO, LEE, and HUSMAN acted maliciously and/or were guilty of a wanton and reckless disregard for the rights, safety, and emotional well being of Plaintiff, and by reason thereof, Plaintiff is entitled to punitive damages and penalties allowable under 42 U.S.C. § 1983 and other state and federal law against them.  No punitive damages are sought directly against the COUNTY.

94.     Plaintiff is also entitled to reasonable costs and attorney's fees under 42 U.S.C. §

1988, California Code of Civil Procedure § 1021.5, and other applicable California codes and laws.

**THIRD CAUSE OF ACTION**
**(42 U.S.C. § 1983 – *Monell* Liability)**
**AGAINST DEFENDANTS COUNTY OF STANISLAUS, CFMG, and MEDICAL DIRECTOR TAYLOR FITHIAN, M.D.**

95.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in this complaint, as though fully set forth herein.

96.    Plaintiff alleges, upon information and belief, the unconstitutional actions and/or omissions of the individually named and to-be-identified COUNTY OF STANISLAUS Defendants, the individually named and to-be-identified CFMG Defendants, and the personnel acting on behalf of Defendant CFMG were pursuant to the following customs, policies, practices and/or procedures of the COUNTY OF STANISLAUS and/or CFMG, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials for the COUNTY and its Sheriff's Department, and/or CFMG, including, but not limited to, the following:

a.   As to the COUNTY OF STANISLAUS:

    i.   Failure to supervise and/or discipline correctional officers and/or deputies for misconduct that results in the violation of citizens' civil rights; and/or,

    ii.   Failing to institute, maintain, or effectively administer an appropriate training regimen on subjects such as use of force and identification and response to serious medical needs, including spinal injuries; and/or,

    iii.   Using or tolerating excessive and/or unjustified force; and/or,

    iv.   Tolerating corrections deputies' failure to conduct and document required cell observations.

b.   As to COUNTY OF STANISLAUS, CFMG, and TAYLOR FITHIAN, M.D.:

    i.   To deny inmates at the COUNTY'S jail access to appropriate, competent, and necessary care for serious medical and psychiatric needs, including, as described herein, by contracting to provide inadequate medical/psychiatric care for jail inmates, by contracting to create financial and other incentives for CFMG to deprive inmates of necessary emergency and hospital care, and by failing to require that all

medical/psychiatric staff and supervisors at the jail be properly trained, supervised, credentialed, and licensed as required by law;

ii.   To fail to properly classify, house, and/or monitor inmates suffering from: negative or unpredictable reactions to the ingestion of a controlled substance, mental health crises, or who are at risk of self-harm and/or who pose a danger to the their own safety, including placement on self-harm watch or suicide watch with proper suicide precautions, including failing to consider in any way the clear and obvious danger of placing inmates at risk of suicide in cells with means to injure themselves (including bunk beds, horizontal bars, clothing, and ligature materials), and without the frequent, logged observation required by law;

iii.   To fail to properly classify, house, and/or monitor inmates suffering from unknown and perilous reactions to the ingestion of an unknown substance, drug induced psychosis, inmates suffering from drug overdoses, and inmates suffering adverse effects from drug ingestion, and/or mental illness, and/or emotional disturbance, as well as failing to ensure that a toxicology screen test is performed to determine the nature of a substance an inmate has ingested, provide appropriate observation and a treatment plan for serious medical needs, prevention, and addressing the risk of self-harm by inmates, suicide attempt prevention, appropriate observation of suicidal or otherwise emotionally disturbed inmates, providing appropriate observation and a treatment plan for inmates suffering the effects of drug-induced states of psychosis and/or overdoses and/or inmates who are a danger to themselves by virtue of being under the influence of drugs and/or mental illness and/or emotional disturbance, as well as care and treatment for mental illness and emotional disturbance, monitoring the mental health and vital signs of inmates, promptly rendering and/or summoning medical care when it is needed, and transferring inmates to inpatient medical or psychiatric facilities where their medical needs require such a transfer;

iv.   To allow, encourage, and require unlicensed, inadequately trained, and inadequately supervised CFMG staff to attempt to render treatment, when a physician is needed, as well as to allow, encourage, and require inadequately trained, supervised, and credentialed CFMG staff to make or be involved with decisions to place jail inmates on, and remove inmates from, safety cell/suicide watch in direct violation of applicable law and standards, including permitting and incentivizing unlicensed and untrained CFMG staff to remove inmates with urgent medical conditions or who might be suffering from drug induced psychosis or severely mentally ill inmates from safety cell/suicide watch without a reasonable, appropriate, and lawful basis for doing so;

v.   To fail to institute proper procedures and training to coordinate inmate

assessment, placement, safety cell/suicide watch decisions, transfers to psychiatric facilities, transfers to emergency, acute care medical facilities, and failing to coordinate or provide appropriate care with the CFMG staff, a jail physician, jail psychiatrist, and/or jail corrections staff where there was an obvious need for such to prevent the harm that occurred here to Mr. Lapachet;

vi. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures for handling, housing, and caring for individuals suffering unknown and toxic reactions to the ingestion of a controlled substance, as well as inmates that are altered, mentally ill, and/or emotionally disturbed inmates at the COUNTY Jail, including alternatives to placing such ill and disturbed inmates in need of treatment in solitary confinement segregation cells that are intended and used to punish inmates, with the obvious consequence that the mental health needs of such inmates remain unaddressed and are in fact aggravated and increased by such punitive treatment;

c.   As to COUNTY OF STANISLAUS, CFMG, and TAYLOR FITHIAN, M.D.:

i. To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a)-(b) above, when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

97.    In the alternative, upon information and belief, Defendant COUNTY OF STANISLAUS and/or CFMG may have instituted policies or training addressing some or all the topics listed above, but with deliberate indifference to citizens' rights, failed to properly oversee, enforce, and/or properly carry out such policies and/or training.

98.    The above-described customs, policies, practices, and/or procedures of the COUNTY and CFMG were a moving force and/or a proximate cause of the deprivations of Plaintiff's constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above in the First and Second Causes of Action.

99.    Defendants COUNTY and CFMG are also liable for the violations of Plaintiff's rights by their final policy makers, including COUNTY OF STANISLAUS Sheriff Adam Christianson and CFMG MEDICAL DIRECTOR FITHIAN, as described above.  (See, Ninth

Circuit Model Civil Jury Instruction 9.6).

100.    The aforementioned customs, policies, practices, and procedures; the failure to properly and adequately train, instruct, monitor, supervise, evaluate, investigate, and discipline on the part of Defendants COUNTY OF STANISLAUS, CFMG, and FITHIAN were a moving force and/or a proximate cause of the deprivations of Plaintiff's clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above.

101.    As a direct and proximate result of the foregoing unconstitutional actions, omissions, customs, polices, practices, and/or procedures of the Defendants named in this cause of action, Plaintiff sustained serious and permanent injuries and damages, and is entitled to damages, penalties, costs, and attorneys' fees, as set forth above, in ¶ 76, and punitive damages against Defendants CFMG and FITHIAN.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF CIVIL CODE § 52.1 (b))**
**AGAINST DEFENDANTS COUNTY, CFMG, FITHIAN, ANTONIO, BERGHORST, TRINIDAD, DEVENDRA, KING, TAWANA, ALEJANDRE, DEOL, TORRES, MARTINEZ, GALLO, LEE, HUSMAN and DOES 7-50**

102.    Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

103.    By their acts, omissions, customs, and policies, the Defendants named in this cause of action acting in concert/conspiracy, as described above, and with threat, intimidation, and/or coercion, violated Plaintiff's rights under California Civil Code § 52.1 and the following clearly established rights under the United States Constitution, under the California Constitution, and under California law:

    a.   The right to be free from deliberate indifference to LAPACHET's serious medical needs while in custody and confined in jail, as secured by the Eighth Amendment to the United States Constitution and by Art. 1, Sec. 17 of the California Constitution; and/or

    b.   The right to be free from the unnecessary and wanton infliction of pain and injury that constitutes cruel and unusual punishment, as secured by the Eighth

Amendment to the United States Constitution and by Art. 1, Sec. 17 of the California Constitution; and/or

    c.    The right to protection from bodily restraint, harm, or personal insult, as secured by California Civil Code § 43.

104.    Violation of Plaintiff's Eighth Amendment rights automatically satisfies all requirements for a Bane Act claim.  See *Rodriguez v. County of Los Angeles,* 891 F.3d 776 (9th Cir. 2018).

105.    Separate from, and above and beyond, Defendants' attempted interference, interference with, and violation of Plaintiff's rights, Defendants violated Plaintiff's rights by the following conduct, among other conduct, constituting threat, intimidation, or coercion:

    a.    Intentionally and with deliberate indifference, depriving and/or preventing Mr. Lapachet from receiving necessary, life-saving, and/or preventative medical and/or psychiatric care and treatment;

    b.    Intentionally and with deliberate indifference, ordering and/or continuing Mr. Lapachet's punitive housing in a segregated and/or disciplinary cell, under conditions of solitary confinement for long stretches of time, without necessary, life-saving medical and/or psychiatric care and treatment;

    c.    Continuing Mr. Lapachet's incarceration instead of summoning medical care and transferring him to an appropriate medical/psychiatric facility, with deliberate indifference to his serious psychiatric and medical needs, and while Mr. Lapachet was powerless to provide for such needs himself;

    d.    Intentionally and with deliberate indifference, causing Mr. Lapachet to languish in jail without necessary medical/psychiatric/pharmacological care, or even the required treatment plan, when he was obviously unable to care for his own needs and was a serious threat to himself;

    e.    Subjecting Mr. Lapachet to unnecessary and wanton pain and injury;

    f.    Intentionally and with deliberate indifference, doing and/or permitting subparagraphs (a) – (e) when it was also obvious that in doing so, Plaintiff could suffer permanent injuries or death.

106.    Defendant COUNTY is vicariously liable under California Government Code § 815.2.

107.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Plaintiff's rights under the United States and California Constitutions and law, Plaintiff sustained injuries and damages, and against each Defendant named in this Cause of Action, is entitled to relief as set forth above, in ¶ 76, and punitive damages against all individual Defendants, including all damages and penalties allowed by California Civil Code §§ 52 and 52.1 and California law, three times actual damages, and attorneys' fees.

**FIFTH CAUSE OF ACTION**
**(MEDICAL NEGLIGENCE)**
**<u>PLAINTIFF AGAINST DEFENDANTS CFMG, FITHIAN, ANTONIO, BERGHORST,</u>**
**<u>TRINIDAD, DEVENDRA, KING, TAWANA, ALEJANDRE, and DOES 7-50</u>**

108.    Plaintiff re-alleges and incorporates by reference the allegations contained in this complaint, as though fully set forth herein.

109.    At all material times, the Defendants named in this cause of action owed Mr. Lapachet, as health care professionals and medical practitioners, the duty to act with due care and to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical practitioners would use in the same or similar circumstances.

110.    As set forth more specifically in the paragraphs above, the named Defendants were negligent because they failed to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful doctors, P.A.s, R.N.s, Psychiatric R.N.'s, and/or L.V.N.'s, and/or other health care professionals, and/or other medical practitioners would use in the same or similar circumstances; their conduct fell below the applicable standard of care.

111.    By the acts and omissions set forth more fully in all of the paragraphs above, the named and to-be-identified Defendants acted negligently and breached their duty of due care owed to Mr. Lapachet as medical professionals, which foreseeably resulted in the suffering of damages by Plaintiff.

112.    As a proximate result of Defendants' negligence, Plaintiff sustained injuries and damages, and against each listed Defendant in this cause of action is entitled to the relief described above, in ¶ 76.  Plaintiff also seeks punitive damages against the individual

Defendants, as well as CFMG.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief against each and every Defendant herein, jointly and severally:

1. Compensatory damages in an amount according to proof, which is fair, just, and reasonable;

2. Punitive damages under 42 U.S.C. § 1983, federal law, and California law, in an amount according to proof and which is fair, just, and reasonable against all Defendants except Stanislaus County;

3. All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §1021.5; California Civil Code §§ 52 et seq. and 52.1; and as otherwise may be allowed by California and/or federal law; and,

4. For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff hereby respectfully demands a jury trial in this action, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: June 26, 2018                     HADDAD & SHERWIN LLP

/s/ *Michael J. Haddad*

MICHAEL J. HADDAD

Attorneys for Plaintiff